557 So.2d 703 (1990)
Dean C. DUPUY
v.
James E. RILEY and Que Sera, Inc.
No. 88-CA-0511.
Court of Appeal of Louisiana, Fourth Circuit.
February 15, 1990.
Rehearing Denied March 21, 1990.
Writ Denied May 25, 1990.
*705 Dennis P. Couvillion, Metairie, for plaintiff-appellee.
Charles C. Garretson, Gulf Breeze, Fla., for James E. Riley.
A.W. Wambsgans, Cronvich, Wambsgans & Michalczyk, Metairie, for June Donnelly.
William A. Neilson, A.D. Freeman, Barbara T. Puchot, New Orleans, for John B. Pratt and William L. Pratt.
Before BARRY, BYRNES and PLOTKIN, JJ.
PLOTKIN, Judge.
This appeal involves two issues: (1) the determination of stock ownership in Que Sera, Inc. and (2) a corporate officer's liability for breach of fiduciary duty in the operation of the corporation's affairs.

FACTS
Que Sera Inc., which operates a restaurant/bar on St. Charles Avenue, was originally owned by three shareholders, Dr. John Paul Pratt, Dr. Alfred Olinde and David McCammon, who each held 1,000 of the total 3,000 shares in the company. Sometime prior to the summer of 1981, McCammon relinquished control of his 1,000 shares to Dr. Pratt.
During the summer of 1981, Drs. Pratt and Olinde were approached by James E. Riley concerning the purchase of Que Sera stock. At that time, Riley and another individual, Dean Dupuy, assumed management, operation, and control of the restaurant. On December 1, 1981, the doctors transferred all 3,000 shares of the stock in the corporation to Riley. On the same day, counterletters in favor of Dr. Pratt's two sons, William and John, were issued. The counterletters stated that Riley was purchasing 600 shares of capital stock for each of the Pratt brothers and obligated Riley to execute an instrument transferring "all right, title and interest" in the shares to the Pratt brothers on demand. A identical counterletter in favor of Dupuy, who managed the restaurant, was also prepared; Riley never signed the counterletter to Dupuy.
In January 1983, Dupuy initiated the instant action by filing suit against Riley and Que Sera, Inc., seeking ownership of the 600 shares of stock which he claimed Riley had orally agreed to transfer to him. The Pratt brothers exercised their right to receive ownership of the stock on February 29, 1984. Then, on March 28, 1985, the Pratt brothers intervened in this lawsuit, adding additional defendants, including June Donnelly, secretary of Que Sera, and Ichabod's Inc., another of Riley's business interests which had allegedly provided management services to Que Sera. The Pratt brothers sought appointment of a receiver based on allegations of mismanagement, self-dealing and breach of fiduciary duty by Riley, Ichabod's and Donnelly. After extensive hearings, the trial court placed the corporation into receivership. That decision was affirmed by this court on appeal. Dupuy v. Riley, 492 So.2d 215 (La.App. 4th Cir. 1986). In its opinion, this court noted that "Que Sera, Riley and Donnelly withdrew all objections to the appointment of a receiver in open court and presented no evidence to contradict the proof of mismanagment [sic], waste, and ultra vires acts presented by the Pratts."
Thereafter, a second trial was conducted. The following issues were considered by the trial judge in the second trial:
1. Ownership of Que Sera stock.
2. The shareholder's derivative action against Riley, Donnelly and Ichabod's Inc. for alleged fraudulent acts, as well as breaches of fiduciary duty to the corporation.
This appeal grows out the the trial court's judgment on those issues.

*706 STOCK OWNERSHIP
On the issue of ownership of the shares of the corporation, the trial judge found that Riley had properly acquired 2,000 shares of the corporation, but that he never properly acquired Dr. Olinde's 1,000 shares because he failed to meet his obligation to pay the outstanding debts of the corporation, including $53,000 due Dr. Olinde. Therefore, the court concluded, the Olinde shares were treasury shares because they were paid for by the corporation itself.
Of the 2,000 shares properly acquired by Riley, the trial court concluded that 1,200 were the property of the Pratt brothers and 600 belonged to Dupuy because he fulfilled his obligation to furnish future services to the corporation and in fact acted as manager of the corporation, as required by the oral agreement between Riley and him. The final 200, the court said, are beneficially owned by Riley; the issuance of Riley's shares was deferred until Riley paid his debts to the corporation.
Riley appeals the trial court's decision awarding Dupuy 600 shares of the stock in Que Sera and the finding that Dr. Olinde's shares are treasury stock; he does not contest the finding that the Pratt brothers own 1,200 shares of the corporate stock.
Dupuy's 600 Shares
Riley claims that the trial court improperly awarded 600 shares of Que Sera stock to Dupuy. This argument is based primarily on his contention that he had previously transferred 1,650 shares of the stock in the corporation to third parties in payment of debts owed prior to his agreement with Dupuy, leaving him only 150 shares in the corporation, since the Pratt brothers own the other 1,200 shares. He claims that the trial judgment awarding Dupuy 600 shares improperly denies the third parties their rightful ownership interest in the corporation.
Riley testified at trial that he transferred 750 shares of Que Sera stock to Ken Canton and "30 per cent" of the stock to his brother, John W. Riley, in payment of personal debts. He admitted that no documentation of the consideration for either transfer exists. Although Riley's testimony concerning his transfer to Canton is corroborated by Canton's testimony, Canton stated that the transfers were made in payment of Riley's portion of a partnership deal. Canton testified inconsistently concerning the stock certificate allegedly prepared to document the transfer. He initially stated that he never received a certificate; later he stated that he told Riley to keep his stock certificate in his office. Canton testified that he never saw a stock transfer instrument and that he did not sign the stock. Canton identified a letter from him to Riley confirming an oral agreement to transfer 25 per cent of the stock, dated October 7, 1982. Although he was a named defendant, John W. Riley never appeared for trial. No stock certificates were presented at trial; testimony indicated that they were last in Riley's possession, but that they, along with the stock register, had been lost. The corporate tax returns do not reflect Canton or John W. Riley as shareholders; Riley says that is a "mistake."
First, we note that Riley could not properly have transferred all but 150 of the outstanding shares of the corporation to third parties if he had a valid agreement with Dupuy concerning 600 shares. His allegation that the debts owed Canton and John W. Riley which formed the alleged consideration for the transfers pre-dated his agreement with Dupuy does not change this result. If a valid agreement with Dupuy existed, he simply had no right to make deals with third parties which rendered that agreement meaningless. Therefore, his reliance on his alleged transactions with Canton and John W. Riley is misplaced.
More importantly, Riley failed to prove that the alleged transfers actually occurred. The trial judge found that Riley's testimony was "unworthy of belief in its entirety," noted his fascination with the "obvious and blatant untruthfulness of Riley on issues both major and minor," and stated that he gave "absolutely no credence to any" of Riley's testimony. Canton did not fare much better in the judge's *707 estimation, since he found that "Canton's testimony generally was completely discredited in cross examination." The Louisiana Supreme Court recently ruled that trial court decisions based on determinations of credibility of witnesses "can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840, 845 (La. 1989). Therefore, the trial court's decision, which essentially ignores and rejects Riley's claim that Canton and John W. Riley have rightful ownership interests in the corporation, must be affirmed.
Riley also contests the trial court decision awarding Dupuy 600 shares of Que Sera stock on the basis of his contention that Dupuy failed to prove entitlement to the shares. Riley claims that his oral agreement with Dupuy was conditioned on three things: (1) payment of the corporation debts, (2) Dupuy's continued participation as manager of the restaurant/bar business and (3) Dupuy's performance of his duties in a workman-like manner. He further claimed that Dupuy was to receive only non-voting stock.
First, we note that the record establishes that Riley's misappropriation of Que Sera funds made it impossible for all the corporate debts to be paid while the business was under his management. Therefore, even if the alleged conditions were a part of the oral agreement between Riley and Dupuy, it was impossible for Dupuy to insure that those conditions were fulfilled. More importantly, the record indicates that the conditions alleged by Riley were never intended to be a part of the agreement.
La.C.C. art. 1846 provides as follows:
When a writing is not required by law, a contract not reduced to writing, for a price or, in the absence of a price, for a value not in excess of five hundred dollars may be proved by competent evidence.
If the price or value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances.
Since the alleged oral agreement between Riley and Dupuy concerned the transfer of stock, a movable, there is no requirement that it be in writing. McRoberts v. Hayes, 248 La. 676, 181 So.2d 390, 392 (1965). In fulfilling the requirements of La.C.C. art. 1846, parties to an action may serve as their own credible witnesses and they are not required to present proof of every detail of the alleged agreement; general corroboration is sufficient. Lee Eyster & Associates, Inc. v. Favor, 504 So.2d 580, 582 (La.App. 4th Cir.1987).
Dupuy testified unequivocally, on numerous occasions at trial, that his agreement with Riley concerning his entitlement to 20 per cent of the stock in Que Sera was not conditional on anything other than his participation as manager of the business, a condition that he met until he realized that Riley was not going to fulfill his end of the agreement. He stated that Riley approached him about the deal and that he was continuously assured that he would get the counterletter. In fact, Dupuy testified that he was originally led to believe that he would be issued a stock certificate, that he did not know a counterletter would be involved. He said that he did not think it was necessary to demand that their deal be put in writing since he thought that Riley was his friend.
Dupuy's testimony was corroborated at trial by a number of witnesses, most notably Dr. Pratt, who testified that he would never have consummated the deal with Riley if he had not been led to believe that Dupuy would be a 20 per cent owner. Dr. Pratt testified that he never intended for his sons to become minority owners. He testified that Riley suggested Dupuy be given an ownership interest because managers stay longer and work better if they have an interest. Dr. Pratt stated that he never heard that there would be conditions on Dupuy's stock ownership. He stated that he called Riley's attorney to make sure there were three counterletters before he signed the documents transferring ownership of the corporate stock to Riley.
Other witnesses who corroborated Dupuy's testimony included Richard James Keene, Bill Martinez, Jacklyn J. Cupit, and Larry Barrios, all of whom testified that they had heard Dupuy and/or Riley discuss *708 Dupuy's entitlement to stock ownership. We therefore hold that the evidence presented at trial established the existence of a valid oral agreement between Riley and Dupuy entitling Dupuy to ownership of 20 per cent of the stock of Que Sera, Inc. The trial court's decision on this issue is affirmed.
Dr. Olinde's Stock
Although he essentially admits that the $53,000 debt to Dr. Olinde was paid with corporate funds, Riley nonetheless contests the trial court's classification of those shares as treasury shares, arguing in brief that he was entitled to use corporate funds to pay personal debts, including the debt to Dr. Olinde, because he was the sole shareholder up until the time the Pratt brothers "exercised" their counterletters on February 29, 1984.
Louisiana jurisprudence contains no cases discussing this issue. However, Fletcher Cyclopedia Corporations, Vol. 3A, Ch. 11, Sec. 1103 states, in pertinent part, as follows:
If an officer is the owner of all the stock of a corporation, it seems that he may use the corporate assets as he sees fit, and there can be no misappropriation of corporate assets by him; but if there is even one share of stock outstanding he cannot use the corporate assets to pay his individual debts without the consent of the holder of such one share of stock. Directors or other officers who misappropriate funds are liable to the corporation just the same as if they had taken the money or property of an individual, notwithstanding they owned substantially all of the stock.
(Footnotes omitted.)
The above discussion indicates that Riley's argument concerning Dr. Olinde's shares might have some merit, if he was indeed the sole shareholder at the time the corporate assets were used to pay the debt to Dr. Olinde. For purposes of this issue, Riley argues that he was the sole shareholder in the corporation from December 1, 1981 until the Pratt brothers exercised their rights under the counterletters in February of 1984. However, inconsistently, on the issue of whether Dupuy is entitled to his 600 shares of the corporation, he claims that he transferred stock to Ken Canton and John W. Riley in October of 1982. Riley cannot have it both ways. Of course, the trial court found that the alleged transfers to Canton and John W. Riley either did not exist or were invalid; we have affirmed on this issue. However, that decision does not result in an automatic finding that Riley was the sole shareholder, entitled to use the corporate funds to pay his personal debts, at the time those funds were used to purchase Dr. Olinde's stock.
First, the trial court held, and we have affirmed, that Dupuy was entitled to ownership of 20 per cent of the stock in Que Sera. Under the terms of the agreement between Dupuy and Riley, as established by Dupuy's testimony, he should have received those shares at the time the deal between Riley and Drs. Pratt and Olinde was consummated. Therefore, had Riley fulfilled the terms of his agreement to Dupuy, as understood by all the parties to those agreements, he would not have been the sole shareholder. Therefore, the benefits of the general rule allowing sole shareholders to use corporate funds to pay their personal debts cannot inure to his benefit.
Second, a close study of the documents executed by Riley in favor of the Pratt brothers at the time he acquired all the stock of the corporation reveals that they did indeed own a "beneficial interest" in the corporation from the time that Riley acquired the corporate stock. Riley argues that the Pratt brothers had no interest in the corporation until they "exercised" their counterletters. He would have us rule that the only right the Pratt brothers acquired under the counterletters was the right to become owners at some nebulous future date. That interpretation might be correct had the Pratt brothers been given stock options; however, their rights under the counterletters were different. Those rights existed at all times after the counterletters were signed.
*709 La.C.C. art. 2025, relative to simulations and counterletters, states as follows:
A contract is a simulation when, by mutual agreement, it does not express the true intent of the parties.
If the true intent of the parties is expressed in a separate writing, that writing is a counterletter.
Therefore, a counterletter expresses the true intention of the parties to a contract, even if another, apparently legal, document seems to indicate a different intent. In the instant case, the counterletter issued to John Pratt stated, in pertinent part, as follows:
That in truth and in fact appearer [Riley] has puchased [sic] six hundred shares (600) of said capital stock for the account of JOHN BARRET PRATT, and with valuable consideration furnished to appearer by the said JOHN BARRET PRATT, and that he will execute in favor of said JOHN BARRET PRATT, or his nominee, at such time as appearer is called upon so to do, an instrument transferring to the said JOHN BARRET PRATT all right, title and interest that appearer has or may have in and to the said capital stock.
(Emphasis added.) The counterletter executed in favor of William Pratt was identical except for the name.
The counterletters state unequivocally that 600 shares of Que Sera stock was purchased by Riley "for the account of" each of the Pratt brothers. That language in the counterletters obligated Riley to protect the interest of the Pratt brothers in the corporation and prevented him from treating the assets of the corporation as his personal property. Therefore, we hold that Riley was not entitled to use the finances of the corporation to pay his personal debts because of the other partiesnamely Dupuy and the Pratt brotherswho had interests in the corporation from the time Riley signed the documents purchasing the stock on December 1, 1981. Thus, the trial court's judgment declaring that the 1,000 shares of Que Sera stock purchased with corporate funds from Dr. Olinde are treasury shares is not manifestly erroneous; that finding is affirmed.

DERIVATIVE SUIT
Saying that Riley's testimony was "unworthy of belief in its entirety," the trial judge found that Riley had "diverted funds of Que Sera to his other ventures or to himself; he breached every rule of fiduciary conduct conceivable; the list of his inconsistent testimony and acts is too long to enumerate herein." He found Riley and Ichabod's Inc. liable to the corporation for $270,900, which he calculated to be the actual loss to the corporation. However, he dismissed the case against Donnelly, saying the Pratt brothers had failed to prove that Donnelly profited financially from any of Riley's fraudulent activities. The Pratt brothers appeal the ruling in favor of Donnelly. Riley has not appealed this issue.
La.R.S. 12:91 provides, in pertinent part, as follows:
Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions.
Certainly the above statute does not require that officers who breach their fiduciary duties to the corporation profit financially from the transactions before they can be found liable for their wrongful actions. Therefore, the trial court committed an error of law in holding that Donnelly is not liable under the facts of this case because the Pratt brothers failed to prove that she had profited financially from Riley's ultra vires acts.
The duties and liability of corporate officers and directors in general are set out in Fletcher Cyclopedia Corporations, Vol. 3, Ch. 11, Sec. 990 as follows:
Like agents in general, a director or other corporate officer must be loyal to the trust, use ordinary and reasonable care, must not exceed the powers of the *710 corporation nor his or her powers as an officer, and must otherwise act in good faith, and is liable for fraud or misappropriation or conversion of corporate assets, and generally is liable for negligence....
(Footnotes omitted.)
The more specific rules governing corporate officer liability for misappropriation of corporate assets are set out in Fletcher Cyclopedia Corporations Vol. 3A, Ch. 11, Sec. 1102 as follows:
The fiduciary relation of the corporate officers to the corporation and its stockholders as a whole imposes upon them the obligation to serve the purpose of their trust with fidelity, and forbids the doing of any act by them, or by any one of them, by which the assets of the corporation are wrongfully diverted from corporate purposes. There is little or no controversy as to the liability in general of directors or other corporate officers for misappropriation, diversion or conversion of corporate assets. Such a liability exists and may be enforced by the corporation, or by the stockholders in a proper case, and may also be enforced, in some cases, by creditors of the corporation....

. . . . .
Funds of a corporation can be lawfully used for corporate purposes only, and if misappropriated by the directors, they and whoever with notice participates with them are jointly and severally liable to the corporation for the loss and damage.
(Footnotes omitted. Emphasis added.)
In the instant case, no documentary evidence concerning the official corporate officers was presented. However, it is uncontested that Donnelly was considered the corporate secretary. She testified that no formalities accompanied her appointment to that position, that Riley simply told her that he had made her secretary of the corporation one day. She said that Riley did not give her anything at that time, no minute book or stock register, and that most of the actions she took for the corporation were performed in her position as an employee, supervising bookkeeper, not as a corporate officer. She claims that her only function as corporate secretary was signing checks, which were first discussed with and approved by Riley. She stated that she had no other authority as secretary.
Nevertheless Donnelly admitted to her status as corporate secretary. Additionally, the record is rife with evidence that she participated in actions which indicate that she did not perform her duties "with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions." LSA-R.S. 12:91. The fact that many of her actions were taken in her capacity as head bookkeeper, if true, does not relieve her of her responsibilities to the corporation as corporate secretary. Additionally, we note that many of her breaches of fiduciary duty occurred because she signed checks which improperly dispersed funds, an action she admittedly took as corporate secretary.
William Legier, recognized as an expert CPA at trial, performed an investigation and issued a report concerning Que Sera's financial situation. He noted that daily sales reports were not completed and that the corporation was delinquent in filing all taxes. Legier said the books evidenced a "very loose" control of proper documentation and tracing of cash disbursements, and that it was thus impossible to tell if money was being paid to purveyors and not being lost or misapplied. Legier said that the company books showed no support for some of the payments made and concluded that it looked like Que Sera was used like "an agency for making payments." He said that Que Sera was not a traditional bar/restaurant from a bookkeeping standpoint.
Extensive testimony was elicited at trial that $100 per day was removed from the Que Sera cash register. Donnelly admitted that she frequently picked up the cash at the end of the week, but she failed to state what she did with it. Dupuy testified that when he confronted her about the cash removals, she said that she took the money to Riley's main office and placed it in a *711 safe. He said that Riley told him the money was being used to set up a retirement fund for the two of them and for Donnelly. Legier stated that Donnelly told him that the $100 cash per day was placed into an account at Bank of the South; however, he said that not nearly all the money taken was in the indicated account.
Legier also testified that unexplained large dispersals of money went to a number of unrelated businesses, most of them owned wholly or partially by Riley. He found that the receipts were lowered and that sales taxes, federal income taxes and profits went unreported. Legier testified that $40,000 to $50,000 from the payroll account was used to pay people who did not work for Que Sera. That testimony was corroborated by Mary Byars, Que Sera manager for four years, who listed a number of people paid by Que Sera to work at other businesses. Donnelly admitted that she wrote large checks to other individuals and business entities without investigating whether the money was being used for legitimate corporate purposes. Additionally, she testified to writing checks from the Que Sera payroll account to persons working for Riley's other business interests. Riley testified that Donnelly signed all tax statements.
Mary Byars testified that while she was managing Que Sera she deposited receipts into a Hibernia Bank account and that only Donnelly wrote checks on that account. She stated that she would write checks for supplies on a Bank of the South account and that she would subsequently call Donnelly to tell her how much to deposit in the Bank of the South account to cover the checks. Byars stated that in December of 1984, many of the checks written on the Bank of the South account were returned NSF. She said that Donnelly kept the spread sheets on the Hibernia account and that the spread sheets showed a negative balance between September of 1984 and January of 1985. Byars said that Donnelly sometimes told her to do work for businesses other than Que Sera and that Donnelly talked to her on numerous occasions about loyalty.
As shown by the above detailed evidence, the record in this case is more than sufficient to prove that Donnelly breached her fiduciary duties to Que Sera as corporate secretary. However, Donnelly argues that her actions should be excused because she believed that Riley was the 100 percent shareholder and she was simply following his orders and doing her job as best she could. However, the record reveals that Donnelly could not have believed that Riley was the sole shareholder at the time all her breaches occurred. Therefore, it is unnecessary for us to decide whether a corporate officer can breach his fiduciary duties to persons who he did not know had an interest in the corporation.
First, Donnelly admitted at trial that she signed some stock certificates for Canton and John W. Riley, presumably in October of 1982. She stated at trial that Riley told her that Canton and his brother were holding stock until he could repay them some money he owed them. Even though the alleged stock transfers to Canton and John W. Riley have been invalidated, Donnelly's own testimony nonetheless reveals that she did not believe that Riley was the 100 per cent shareholder subsequent to her signing of the certificates.
Second, Byars' testimony reveals that many of Donnelly's improper actions occurred between September of 1984 and January of 1985. The Pratt brothers exercised their counterletters in February of 1984, so Donnelly certainly did not believe that Riley was the sole shareholder in the corporation during that period.
Third, the trial judge made a specific factual finding that Donnelly "testified very loosely with the truth, particularly in not knowing the Pratt brothers were shareholders of the Corporation." We cannot say that the trial judge was manifestly erroneous in this finding. For that reason also, we cannot excuse Donnelly's actions on the basis of her contention that she thought that Riley was the 100 percent shareholder.
Because we find that Donnelly breached her fiduciary duties as corporate secretary of Que Sera, we reverse the trial court's *712 judgment dismissing her from liability. We hold that Donnelly is liable jointly, severally and insolido with Riley and Ichabod's Inc. for the $270,000 actual loss to the corporation found by the trial judge.

MOTION TO STRIKE
Because the record of the second trial proceeding is sufficient to establish Donnelly's liability to the corporation, we have not considered evidence adduced at the receivership hearing nor have we considered Donnelly's deposition testimony. Therefore, it is unnecessary for us to rule on Donnelly's motion to strike.

CONCLUSION
For the above and foregoing reasons, the trial court's judgment concerning ownership of the stock in Que Sera is affirmed. The trial court judgment dismissing the action against June Donnelly is reversed and Donnelly is cast liable jointly, severally and insolido with Riley and Ichabod's Inc. for $270,000. In all other respects, the judgment of the trial court is affirmed.
AFFIRMED IN PART; REVERSED IN PART; RENDERED.

ON APPLICATION FOR REHEARING
PER CURIAM.
In this application for rehearing, defendant June Donnelly seeks reconsideration of our original decision holding her liable to Que Sera Corporation in solido with defendant James E. Riley for $270,000, based on our finding that she breached her fiduciary duties as corporate secretary. We issue this per curiam to address some of the arguments presented by her application.
First, Donnelly claims that this court committed manifest error because it reversed the trial court's factual determinations and credibility judgments and substituted its own findings of fact. Donnelly misstates this court's judgment. Our reversal of the trial court decision was based on the finding that the trial court's legal conclusions were incorrect. In reality, we accepted the trial court's factual findings, which were minimal. The trial court stated expressly that he had "many questions" concerning Donnelly's testimony. He based his decision to render "no judgment" against Donnelly on his conclusion that he was "unable to find that Donnelly herself profited financially from the fraudulent depradations of Riley." As stated in our opinion, profit at the expense of the corporation is not the standard for director liability. On that basis, we reversed the trial court's decision and applied the correct standard for determining corporate officer liability, i.e., breach of fiduciary duty.
Second, Donnelly claims that this court misapplied the statutory law, but her argument on that issue is mostly factual. Donnelly cites LSA-R.S. 12:601, which states that stock is legally owned by the "person, firm or corporation in whose name the certificate representing shares of stock stands." She claims that the intervenors were therefore unable to ascribe any knowledge of their interest in the corporation to her.
Donnelly again misses the point. She seeks to avoid liability for her improper actions as secretary of the corporation on the basis of her argument that she believed that Riley was the 100 percent shareholder of the corporation at the time those actions were taken. Donnelly claims that all of her actions were taken on orders from Riley. We have rejected that argument for a number of reasons. First, as discussed in our original opinion, the record indicates that Donnelly could not have believed that Riley was the 100 percent shareholder in the corporation at the time that many of her breaches occurred because she admits that she signed the certificates transferring stock to Canton and to John W. Riley in October of 1982. Additionally, again as detailed in the original opinion, many of her breaches occurred after February 29, 1984, when the Pratt brothers exercised their counterletters, as revealed by the testimony of Mary Byars. Donnelly cannot be allowed to avoid liability for breaches of the fiduciary duty imposed on her as secretary of the corporation by hiding behind an allegation not supported in the record.
More importantly, even if the record supported Donnelly's contention *713 that she believed that Riley was a 100 percent shareholder in the corporation at the time her improper actions occurred, that fact could not absolve her from liability, especially under the facts of this case. Corporate officers have a statutory duty to perform their duties prudently. LSA-R.S. 12:91. Donnelly's actions, as detailed in our original opinion, were obviously not prudent; thus, she breached her fiduciary duties to the corporation. As corporate secretary, Donnelly owed responsibilities to the corporation itself, not to Riley personally. Corporations are separate juridical persons from their shareholders. The distinction is important in this case especially because Donnelly admits that she was aware that parties other than Riley had at least beneficial interests in the corporation. She testified that she was aware of the agreement between Riley and Dupuy; she admits she signed the counterletters to Canton and John W. Riley. As secretary of the corporation, Donnelly had the responsibility to act as a prudent administrator in performing her duties; her failure to do so exposes her to liability for the resulting loss to the corporation.
On rehearing, for the first time, Donnelly attempts to contest her status as secretary of the corporation, noting that neither the stockholders nor the board of directors approved her appointment. This argument comes much too late, as Donnelly has admitted her status as secretary of the corporation numerous times during the course of this litigation, both in testimony and in briefs and pleadings. As an ancillary to this argument, Donnelly argues that this court improperly imposed duties normally reserved for the corporate treasurer on her. No one has alleged that Donnelly was the corporate treasurer and this court's decision is not based on that finding. The duties imposed on Donnelly were simply those she admitted in her testimonyshe signed checks as corporate secretary. That status imposed fiduciary duties on Donnelly to prudently administer the funds of the corporation, duties which were obviously breached. Donnelly's contention that those duties were improperly imposed is semantic. In this corporation, the secretary signed the checks; the fact that that duty is reserved to the treasurer in many other corporations has no bearing whatsoever on this controversy.
Donnelly also contests this court's failure to address her exception of prescription, which was filed in this court on the day of oral argument. La.C.C.P. art. 928(B) provides that peremptory exceptions, including prescription, "may be pleaded at any stage of the proceeding in the trial court prior to submission of the case for decision." However, the caselaw has established that prescription may be pleaded at any time, even on appeal, prior to submission of the case for decision. Marshall v. Marshall, 390 So.2d 1365 (La. App. 4th Cir. 1980), writ granted and remanded for consideration of prescription plea filed in Supreme Court, 396 So.2d 1329 (La. 1981). However, Donnelly did not brief the prescription issue prior to our decision; therefore it was considered abandoned under Uniform Rules-Courts of Appeal 2-12.4. However, since the prescription plea can be considered by this court on its own motion, it will be addressed now.
Donnelly claims that the Pratt brothers' claim against her was prescribed under the one-year prescriptive period which applies to breaches of duty when they filed their intervention on April 29, 1985. This argument is apparently based on the fact that Mr. Legier's report was based on information for the period prior to January of 1982. Her other arguments on this issue are confusing and repetitive. Nevertheless, we find that the Pratt brothers' claims against Donnelly for breaches of her fiduciary duty to the corporation were not prescribed when they filed their intervention to this suit. Our original opinion detailed Byars' testimony, which established that Donnelly's improper actions continued at least until January of 1984, just three months before the Pratt brothers filed their intervention. Their cause of action against Donnelly was based on her breaches of fiduciary duty beginning in February of 1982, when she admits that she was appointed secretary; those breaches *714 continued at least until January of 1984. Therefore, Donnelly's prescription argument has no merit.
Finally, Donnelly alleges that she cannot be liable to the Pratt brothers for any breaches of fiduciary duty prior to February 29, 1984, when they exercised their counterletters. This court's decision held Donnelly liable in solido with Riley for the $270,000 actual loss to the corporation found by the trial court. Donnelly's liability, like Riley's liability, is to the corporation, not to the Pratt brothers personally. The Pratt brothers filed a shareholders' derivative action, in which they asserted the rights of the corporation. The fact that the Pratts did not exercise their counterletters until after many of the illegal actions occurred does not affect the liability of the defendants to the corporation in a derivative action. Donnelly admits that she was appointed secretary in February of 1982, just three months after Riley took over operation of Que Sera in December of 1981. The actions of Riley and Donnelly together caused great loss to the corporation. Once the Pratt brothers became shareholders in the corporations, they gained the right to assert the rights of the corporation in a derivative action. Donnelly's liability is not limited to the period after the Pratts exercised the counterletters; therefore, this argument has no merit.
Donnelly's other arguments on rehearing are mostly repetitive of those already addressed. None of her arguments is persuasive. For those reasons, this court affirms its original decision holding Donnelly liable jointly, severally and in solido with Riley for the $270,000 actual loss to the corporation.