United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 22, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 04-30141

———————————————

COURTNEY ROGERS,

Plaintiff - Appellant

v.

ROBERT E. BROOKS, DAVID M. BROOKS,
and LYNDA K. BROOKS,

Defendants - Appellees,

———————————————

Appeal from the United States District Court
for the Middle District of Louisiana

———————————————

Before WIENER and PRADO, Circuit Judges, and KINKEADE, District
Judge.[*]

PER CURIAM:[**]

In this case, one party to contract negotiations alleges
that those negotiations led to a final agreement for the sale of
an oil company. Because the district court correctly concluded
that these negotiations never resulted in an enforceable contract
and that there are no alternative ways to enforce the alleged
promise, we affirm.

———————————————

[*]District Judge of the Northern District of Texas, sitting
by designation.

[**]Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIRCUIT
RULE 47.5.4.

1

**Background Facts and Procedural History**

Appellees Robert Brooks ("Brooks"), his wife Lynda Brooks, and their son David Brooks own Oracle Oil, L.L.C., a Louisiana oil company. In the fall of 2002, Appellant Courtney Rogers offered $100,000 to buy Oracle's leases, which Brooks had placed for sale at an auction. Brooks rejected this offer. Later, Rogers offered $150,000 for the leases and some equipment (such as a backhoe and a tractor) that had been excluded from the original auction package. This offer, too, was rejected. Rogers then made a second $150,000 offer for the leases, this time excluding the equipment.[1] Brooks agreed to this price. According to Brooks, Rogers then discovered that transferring the leases would cause him to incur significant regulatory fees. Rogers asked Brooks to consider selling him all the membership interest in the company, instead of the leases, to avoid these fees. Brooks agreed to consider this request. The parties continued to negotiate, but the negotiations fell apart over a dispute concerning December operating expenses. Finally, in December 2002, Rogers offered Brooks $141,000[2] for all the

---

[1]At various points, Rogers contended that these $150,000 offers were for all the membership interest in Oracle itself. This position contradicts some of Rogers's other statements. Regardless of the specifics, the parties both agree that the original offer was for the leases, that several different offers were made, and that at some point the offer became for the sale of Oracle.

[2]Brooks's statement of facts indicates that this amount was $140,000.

interest in Oracle, minus a tractor and mower.  Brooks agreed to this price, and the parties agreed that Rogers's lawyers would draft written sale documents.

Rogers's lawyers forwarded the written agreement, called the Unit Purchase Agreement, to Brooks.  Brooks found several of the terms unreasonable.  In particular, Brooks objected to the warranties[3] contained in the written agreement because the parties had discussed an as-is sale.  Claiming that his decision was due to these warranties, Brooks did not sign the Unit Purchase Agreement and refused to negotiate further with Rogers.[4]

Following this refusal, Rogers sued Brooks, Lynda Brooks, and David Brooks in the Middle District of Louisiana.  The suit included claims for breach of the written Unit Purchase Agreement, along with claims for detrimental reliance, negligent misrepresentation, wrongful conduct, unjust enrichment, and unfair trade practices.  Notably, the complaint did not refer to an oral contract.  Almost immediately, the Brooks Defendants

---

[3]Rogers contends that the contract did not contain warranties.  According to Rogers, the terms were merely requests for disclosure, not warranties.  Yet the section in question is titled "Representations, Warranties and Covenants of Seller" and requires the seller to "jointly and severally, represent[], warrant[] and covenant[]" that Oracle has good title that is clear of all liens, that Oracle has complied with all leases, and that there are no conditions that would give rise to litigation.

[4]Rogers, on the other hand, contends that Brooks backed out of the deal because the price of oil rose dramatically and Brooks could make more money by not selling the company.  Rogers emphasizes that Brooks has not since placed the leases for auction or attempted to sell Oracle.

3

moved for summary judgment.  In his response, Rogers contended for the first time that Brooks had breached an oral agreement to sell the Oracle interest for $141,000.

The district court granted the Brooks Defendants' motion, ruling that "no valid contract was entered into between the parties in this case."  Further, the court determined that "there is no dispute that a contract was never agreed upon or reduced to writing."  The district court entered judgment, and Rogers timely filed a notice of appeal.

Because the district court decided this case on a motion for summary judgment, we review its decision de novo.  *Am. Home Assurance Co. v. United Space Alliance, LLC*, 378 F.3d 482, 486 (5th Cir. 2004).  Summary judgment is appropriate when no genuine issues of material fact remain and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).

**Breach of Contract**

Although Rogers originally sued to enforce the Unit Purchase Agreement, he now contends that Brooks breached an oral agreement.  Because of this contention, we must first address whether an oral contract would be enforceable.  Here, the enforceability of an oral contract depends upon two issues.  The first is whether, under Louisiana law, this general type of contract must be in writing.  The second issue is whether this particular contract had to be written because the parties

4

intended it to be in writing.

Rogers contends that, although a sale of an oil and gas lease must be in writing, the sale of interest in a limited liability company ("L.L.C.") does not require a writing. In general, this contention is true--the sale of an oil and gas lease must be in writing, whereas the sale an L.L.C. does not necessarily have to be in writing.[5] All that would normally be required for the sale of membership interests would be an agreement about "[t]he thing, the price, and the consent of the parties." LA. CIV. CODE ANN. art. 2439 (West 1996). Essentially conceding this point, Appellees do not contend that, in general, a sale of the interest in an L.L.C. must be in writing.

Instead, Appellees emphasize the second issue and argue that their contract must be in writing because, to the extent that the parties reached any agreement,[6] they anticipated a written contract. Louisiana Civil Code article 1947 states "[w]hen, in the absence of a legal requirement, the parties have contemplated

---

[5]A membership interest in a L.L.C. is an "incorporeal movable" under Louisiana law. LA. REV. STAT. ANN. 12:1329 (West 1994). Unless other specific rules apply, a contract for a sale of movable property generally does not need to be in writing. *See* LA. CIV. CODE ANN. art. 1846 (West 1987); *Dupuy v. Riley*, 557 So. 2d 703, 707 (La. App. 4th Cir. 1990)("Since the alleged oral agreement between [the parties] concerned the transfer of stock, a movable, there is no requirement that it be in writing.").

[6]Appellees dispute this point. They argue that the parties never reached an agreement--oral or otherwise--and that at most, they were engaged in negotiations, which fell apart over the proposed warranties.

a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form."  Under this article, for example, if parties intend to enter into a written contract, they are presumed not to be bound until the contract is signed.

Several Louisiana courts have applied this rule.  For example, in *Baldwin v. Bass*, the court concluded that a prospective homeowner did not intend to be bound by a contract with a builder when that contract was mailed to her but she intentionally refrained from signing it.  *Baldwin*, 685 So. 2d 436 (La. Ct. App. 1996).  Similarly, in *Carter v. Huber & Heard, Inc.*, an employee could not enforce a two-year employment term when the parties anticipated entering into a written employment contract but never finalized its terms.[7]  657 So. 2d 409 (La. Ct. App. 1995).

Here, the parties clearly anticipated entering into a written contract.  In fact, Rogers asked his own lawyers to draft the agreement.  Although Rogers contends that this written contract was merely to "memorialize" the deal, this distinction is not significant.[8]  Under article 1947, the contract had to be

---

[7]*Carter* was primarily a detrimental reliance case.  *Carter*, 657 So.2d at 411.  The court ruled against the employee on this claim but used the contract's failure under article 1947 as an alternative basis for its decision.  *Id*. at 412.

[8]Furthermore, Rogers's complaint only requests enforcement of the written, unsigned contract with all its provisions, not an

in writing to be enforceable.  For this reason, the district court properly granted summary judgment on Rogers's breach of contract claims.

**Detrimental Reliance**

The first of his noncontractual claims, Rogers's detrimental reliance claim is based on Louisiana Civil Code article 1967, which provides in part: "A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying."  To recover for detrimental reliance, a plaintiff does not need to establish an enforceable contract as he would under a breach of contract claim.  *Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1069 (5th Cir. 1993).  Nevertheless, a plaintiff must show that he detrimentally relied on a promise and that his reliance was reasonable.  *Id.*

Rogers contends that he relied on Brooks's promise to sell Oracle by taking several actions that cost him over $60,000.  These actions included hiring his own field supervisor, selling interests to new partners, and having detailed meetings with Earl McNutt, Oracle's supervisor at the time.  Rogers also states that he received logs, asked Oracle's existing insurer whether coverage would extend after the transfer, found new equipment, and analyzed costs.

---

oral agreement.

7

Appellees challenge the reasonableness of this reliance. They contend that Rogers was unreasonable to rely on oral promises before executing a written contract, particularly since his own lawyers were the ones drafting the proposed contract.

This court is not the first to analyze detrimental reliance when the parties planned to enter into a written contract. In *Carter*, the Louisiana Third Circuit Court of Appeal faced an analogous situation. In *Carter*, a former employee agreed to return to manage the defendant's motel. 657 So. 2d at 411. The employee insisted on a two-year employment term and had his lawyers draft a contract. *Id*. Although they exchanged drafts, the parties never signed a formal employment agreement. *Id.* Nevertheless, the employee began work. *Id*. Before two years passed, the employer sold the hotel, thereby ending the employment. *Id*. The employee sued, claiming detrimental reliance. *Id*. The trial judge found that the employer had never made a promise, and that, even if it had, the employee's reliance on that promise would be unreasonable. *Id*. at 412. The appellate court agreed. *Id*.

Similarly, here the parties anticipated entering into a written agreement, and the proposed written agreement contained terms that were not mutually agreeable. Given the amount of on-and-off negotiation that the parties had gone through in the past, any reliance on an alleged promise to sell Oracle was

8

unreasonable.  Thus, summary judgment was proper on Rogers's detrimental reliance claim.

**Negligent Misrepresentation/Wrongful Conduct**

Rogers further alleges that Brooks engaged in negligent misrepresentation by canceling their deal.  "A person commits the tort of negligent misrepresentation when (1) he has a legal duty to supply correct information; (2) he breaches that duty; and (3) his breach causes damages to the plaintiff." *Soc. of the Roman Catholic Church of the Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co.*, 126 F.3d 727, 742 (5th Cir. 1997).  The tort can be committed with misinformation or with nondisclosure.  *Id.*

For this claim, Rogers merely alleges that Brooks permitted Rogers to "tak[e] actions and incur[] expenses with Robert Brooks' knowledge and encouragement."  Rogers does not explain, however, how this is actionable misrepresentation.  Nor do we perceive it to be misrepresentation.  Appellees were entitled to summary judgment on this claim.

**Unfair Business Practice**

Rogers next claim is for unfair business practice under the Louisiana Unfair Trade Practices Act, Louisiana Revised Statute 51:1405(A).  This statute prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce".  LA. REV. STAT. ANN. § 51:1405(A)(West 2003).  Under this law, "a practice is unfair

9

when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious." *Jarrell v. Carter*, 577 So. 2d 120, 123 (La. App. 1st Cir. 1991).

The only unfair business practice Rogers alleges is that "Robert Brooks canceled the deal after the increased price of oil made Oracle more valuable." Breach of a contract, without more, is not actionable: "the statute does not provide an alternate remedy for simple breaches of contract. . . . There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes." *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993)(citation omitted). Because Rogers has not pointed to any other unfair or deceptive act, summary judgment was appropriate on this claim.

**Unjust Enrichment**

Rogers's final noncontract claim is for unjust enrichment. Under Louisiana law, an unjust enrichment claim contains the following elements: "(1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of 'justification' or 'cause' for the enrichment and impoverishment, and (5) there must be no other remedy at law available to plaintiff." *Baker v. Maclay Props. Co.*, 648 So. 2d 888, 897 (La. 1995); *see also Edmonston v. A-Second Mortgage Co.*

10

*of Slidell, Inc.*, 289 So. 2d 116 (La. 1974).

Rogers contends that the Brooks family was unjustly enriched by the actions he took in reliance on their deal. Nowhere does Rogers explain, however, how his actions enriched anyone. These actions primarily involve Rogers's efforts to transfer Oracle's business to himself. They include hiring his own field supervisor, selling interests to new partners, holding meetings, receiving logs, and checking on the continuation of Oracle's insurance coverage. These actions do not benefit Brooks or Oracle in any way. Because Rogers has not presented any evidence of enrichment, summary judgment on this claim was proper.

**Conclusion**

For these reasons, we affirm the district court's grant of summary judgment on all of Rogers's claims.

AFFIRMED.