# United States Court of Appeals
# for the Fifth Circuit

————————

No. 24-30806

————————

United States Court of Appeals
Fifth Circuit

**FILED**
August 6, 2025

Lyle W. Cayce
Clerk

CAM Logistics, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Pratt Industries, Incorporated; Pratt (Rockwall Corrugating), L.L.C.,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:20-CV-445

———————————————————————

Before King, Smith, and Douglas, *Circuit Judges*.

Dana M. Douglas, *Circuit Judge*:

Appellant CAM Logistics, L.L.C. ("CAM") sued Appellee Pratt (Rockwall Corrugating) L.L.C. ("Rockwall"), raising breach of contract and detrimental reliance claims stemming from a series of negotiations and proposed agreements for warehousing services. CAM appeals from the district court's summary judgment, in which the court dismissed all claims. We AFFIRM.

No. 24-30806

I

CAM is a company that specializes in supply chain services and solutions, including freight shipment and warehousing. Patrick Shea is the vice president of CAM. Pratt Industries, Inc. ("Pratt") is a corrugated packaging company. Rockwall is a company that operates a facility in Rockwall, Texas, that produces recycled paper and corrugated paper packaging. During the time relevant to this appeal, Richard Turner was a strategic account manager employed by Pratt (Jet Corr), Inc., a separate company affiliated with Pratt and Rockwall.

Around October 23, 2017, Turner and Shea met at a business conference in Detroit, Michigan. Shea told Turner that CAM provided warehousing services. Turner informed Shea that his employer's parent company, Pratt, had recently earned new business from Procter & Gamble Company ("P&G"). Per that arrangement, Pratt's affiliate entity, Rockwall, would supply corrugated packaging material to a P&G supplier in Pineville, Louisiana. Turner, who managed Pratt's relationship with P&G, told Shea that he needed a warehouse in central Louisiana to facilitate the new business award. Specifically, Rockwall needed the warehouse space in Louisiana to store the corrugated packaging material it manufactured in Texas for shipment to the P&G supplier in Pineville. After the conference, Turner referred CAM (and other supply chain companies) to Rockwall's general manager, John Batts, for consideration. Batts ultimately decided to pursue discussions with CAM.

On October 24, 2017, Shea emailed Turner and Batts to determine Rockwall's warehousing needs and to provide a quote upon receiving a response. On behalf of Pratt, Turner replied to that message with an overview of the corrugated packaging materials' supply chain, the warehouse needs, and basic contract provisions, including an anticipated contract term

spanning from January 1, 2018, to December 31, 2020. On December 1, 2017, Shea responded with CAM's bid, which included monthly rates for Rockwall's warehousing needs that increased from the first year to the second year of the proposed contract term, and remained stable from the second year to the third year.[1]

Unsatisfied with CAM's quote for warehouse services, Batts reentered price negotiations with Shea over the phone. Shea testified that, on December 6, 2017, CAM offered to lower its pricing by approximately 5%, and Batts accepted on Rockwall's behalf—this exchange was not placed in writing. Thereafter, Batts notified Shea on a phone call that CAM's bid would be accepted. On the same call, Shea offered for CAM to prepare a first draft of the contemplated contract. Following through, on December 11, 2017, Shea sent a draft of CAM's warehousing services agreement (the "December 2017 Draft") to Batts for Rockwall's legal team to review. Among other provisions, this draft contained the same three-year contract term proposed in CAM's bid.

Shea testified that, during this period of review, CAM informed Rockwall that it would need to lease warehousing space in the Alexandria, Louisiana area to meet Rockwall's needs.[2] CAM sought to secure a three-year lease with England Economic and Industrial Development District ("EEIDD"), a warehouse owner and logistics services provider based in Alexandria, but Shea encountered problems while trying to successfully

_____

[1] According to the email from Shea to Turner and Batts, the increase in monthly rates from the first year to the second year resulted from an expected 20,000-square-foot increase in warehouse space.

[2] CAM visited multiple sites to locate a warehouse that it could suggest to Rockwall. At each location it visited, CAM only inquired about the availability of a three-year lease.

negotiate the lease.  He contacted Batts for assistance with overcoming the EEIDD lease negotiation hurdles.  In an email to Batts, Shea inquired about the status of the December 2017 Draft because CAM "[n]eed[ed] to sign the lease" of the warehouse space.  Batts responded that the draft was still being reviewed by Rockwall's legal department.  Shea then asked if Rockwall could issue a purchase order for the projected cost of three years of services, presumably so that CAM could provide EEIDD with assurances that would help with finalizing the lease.  Batts rejected this request, stating that Rockwall could not "sign" anything without the approval of its legal department.  Nonetheless, Shea proceeded with the lease negotiations.  In January 2018, he fully executed a lease agreement between CAM and EEIDD for a three-year term that extended from January 1, 2018, to December 31, 2020.

Though the December 2017 Draft had not been signed by either party, CAM began providing warehousing services to Rockwall in January 2018, sending Rockwall monthly invoices for payment.  Apart from the invoice for January 2018,[3] CAM issued invoices in advance for services to be rendered the following month (which Shea testified was CAM's usual practice when providing warehousing services), and the monthly servicing fee on each invoice was $49,928.69.  Rockwall typically paid these invoices during the same month the warehousing services were rendered.

On April 24, 2018, Batts emailed Shea a version of the December 2017 Draft that had been marked up with proposed revisions by Rockwall's legal department (the "April 2018 Draft").  The revised draft kept the previously

_____

[3] The January 2018 invoice included a notation stating that the invoice was for a "prorated charge," which Shea confirmed was for CAM's calculated start-up costs given that the warehouse was not ready to provide full services as of January 1, 2018.  The fee for this invoice was $47,845.36, which Rockwall paid.

proposed three-year term, which was stated to have a start date of January 1, 2018.

On May 18, 2018, after hearing no response from Shea about the substance of Rockwall's proposed revisions, Batts followed up with Shea regarding the April 2018 Draft, stating that Rockwall "needed to get [the contract] put to bed." There is no response from Shea to Batts's follow-up on record. Shea later testified that he could not "recall" whether he discussed the April 2018 Draft with Batts after receiving it from Rockwall.

At some point during the summer of 2019, Batts informed Shea that, due to changes in P&G's supply chain and needs, there was a possibility that CAM's warehouse services would no longer be needed. In January 2020, Batts told Shea "that the warehouse was not needed anymore and that, in light of the fact that Rockwall's relationship with CAM was at-will, the relationship would be ending." Batts formalized this termination in an email to Shea in March 2020.

For twenty-eight months, CAM provided warehousing services to Rockwall, and Rockwall paid the monthly service fee charged by CAM for those services. Specifically, this arrangement persisted from January 2018 to April 2020.[4] In the end, it is undisputed that neither CAM nor Rockwall executed the December 2017 Draft, the April 2018 Draft, or any other written agreement.

II

───────────────────────────

[4] Notwithstanding the originally contemplated increase in the monthly fee from $49,928.69 in 2018 to $55,728.66 in 2019 and 2020 (as provided in CAM's bid, the December 2017 Draft, and the April 2018 Draft), CAM's invoices reflect no rise in price. Additionally, contrary to Shea's representation to Batts and Turner via email, the record does not show any increase in warehouse square footage from 40,000 in 2018 to 60,000 in 2019 and 2020 that would have caused a price increase.

CAM filed the underlying suit against Pratt and Rockwall in April 2020, asserting claims for breach of contract and detrimental reliance. Pratt was dismissed for lack of personal jurisdiction, leaving Rockwall as the sole defendant. Prior to the close of discovery, CAM moved for partial summary judgment on its breach of contract claim. At issue was whether a binding contract existed between the parties, and if so, whether the contractual relationship persisted for a fixed or unspecified duration.

As to the existence of a contract, the district court stated that, "[w]hile the evidence in the record suggests that the parties intended to be bound formally by written and signed agreements, that did not happen, and both parties acknowledge this failing." The court determined that only an oral agreement was formed between the parties, under which Rockwall shouldered "an obligation to pay monthly service fees to CAM for warehouse and distribution services." Because "the record [was] not sufficiently developed for" the court to ascertain whether the duration of that obligation "was fixed at three years or if it was unspecified and allowed Rockwall to render payments on more of a month-to-month basis," the court denied CAM's motion for partial summary judgment.

After the close of discovery, Rockwall moved for summary judgment. Rockwall contended that there was no genuine dispute that (1) the parties always intended for their agreement to be memorialized in writing and executed, but that never happened, (2) the oral agreement between the parties never contained a fixed term of duration, and (3) CAM's detrimental reliance claim failed because it could not rely on either an unexecuted agreement or a verbal negotiation when both parties contemplated a written contract. The district court granted the motion.

Regarding CAM's breach of contract claim, the court concluded that article 1947 of the Louisiana Civil Code—and its presumption that the parties

were not bound without a written and executed contract—applied to the case because CAM and Rockwall bargained for a written contract. Further, the court rejected CAM's argument that Rockwall's performance under the oral agreement constituted tacit acceptance or ratification of the three-year term deriving from the draft contracts and the parties' discussions. As to whether the oral agreement contained a specified duration for performance and completion, the court found that it did not. The court explained that, having "made the determination that the proposed written contract and its terms are unenforceable," it could "definitively say that CAM cannot cherry pick the three-year term from the ashes of [an] unexecuted draft contract form to accept it as the duration of the oral contract." Regarding CAM's detrimental reliance claim, the court concluded that it was unreasonable for CAM to have relied on the existence of a three-year contract term when finalizing the lease with EEIDD because no fixed term was ever assented to by CAM or Rockwall, either orally or in writing. Accordingly, CAM's claims for breach of contract and detrimental reliance were dismissed.

CAM moved for reconsideration of the district court's summary judgment, which the court denied. CAM now appeals from the district court's orders denying CAM's motion for partial summary judgment and granting summary judgment in favor of Rockwall.[5]

III

We review summary judgment de novo, "applying the same legal standards that controlled the district court's decision." *White v. Life Ins. Co.*

---

[5] CAM's notice of appeal indicates that it also appeals the district court's denial of its motion for reconsideration. But since CAM's appellate briefing does not raise any challenge to that ruling, we need not consider it here. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) (stating that "[a] party forfeits an argument . . . by failing to adequately brief the argument on appeal.").

*of N. Am.*, 892 F.3d 762, 767 (5th Cir. 2018); *see also Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 308 (5th Cir. 2023). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.'" *Ahders v. SEI Priv. Tr. Co.*, 982 F.3d 312, 315 (5th Cir. 2020) (quoting *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)). "We construe all facts and inferences in the light most favorable to the nonmovant." *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (citing *Milton v. Tex. Dep't of Crim. Just.*, 707 F.3d 570, 572 (5th Cir. 2013)).

## IV

On appeal, CAM contends that the district court's ruling was based on the following "legal errors": that (1) the presumption created by article 1947 cannot be rebutted through performance; (2) confirmation and ratification are inapplicable where relative nullities of lack of signature and lack of corporate approval are alleged; and (3) CAM's reliance was unreasonable as a matter of law because the parties contemplated a written agreement. CAM further contends that "the evidence created genuine issues of material fact as to whether the parties agreed to a three-year term and whether the parties bargained for a certain form." We address each argument in turn.

## A

We first discuss CAM's challenge to the district court's application of article 1947 to this case, and the court's determination that the presumption of article 1947 was not rebutted by Rockwall's performance.

No. 24-30806

Article 1947 provides: "When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form." LA. CIV. CODE ANN. art. 1947 (1985). In *Breaux Brothers Construction Company v. Associated Contractors*, the Louisiana Supreme Court expounded on this principle of law:

> Since the parties in the instant case intended from the beginning to reduce their negotiations to a written contract, neither the plaintiff nor the defendant was bound until the contract was reduced to writing and signed by them. Therefore, even if all of the terms of the alleged contract between plaintiff and defendant had been verbally agreed upon, no valid contract would have existed between the parties . . . .

77 So. 2d 17, 20 (La. 1954); *see also Johnston v. Johnston*, 469 So. 2d 31, 32 (La. App. 1st Cir. 1985) ("Even if all terms of the alleged contract have been verbally agreed upon, so long as it is a part of the bargain that the contract be reduced to writing, no valid contract exists until it is reduced to writing.").

1

As a threshold observation, we note that CAM does not press the inapplicability of article 1947 beyond a single sentence in its opening brief. In any event, we hold that the district court aptly determined that the presumption established by article 1947 applies to this case.

The record, even taken in the light most favorable to CAM, indicates that both parties contemplated a written agreement to be bound. As for CAM, Shea himself took the initiative of requesting a sample warehouse agreement from Rockwall, which Rockwall supplied. After determining that the sample agreement did not provide *sufficient protections* to CAM, Shea offered for CAM to prepare a first draft of a written services agreement that would capture the parties' obligations. In doing so, Shea even engaged an

9

attorney to prepare the draft agreement, which he testified was not the normal practice of his company when it came to drafting warehousing services agreements. But since the agreement with Rockwall presented "a tremendous amount of risk" because, *inter alia*, it required "operating with a big company that [CAM] didn't know a lot about," Shea "[w]anted to make sure that [CAM's] ducks were covered and [its] butt was protected." In turn, CAM's counsel prepared the December 2017 Draft, and Shea sent it to Rockwall for review. These facts illustrate CAM's contemplation of being bound by a written contract.

Notably, when asked during a deposition whether he had an understanding that Rockwall required an executed agreement, Shea answered, "[w]ell, *we* wanted one." To the next question, asking again whether Rockwall wanted an executed agreement, Shea said that he could not "speak for Rockwall."

But the record speaks loud enough. Batts testified that, during the negotiations between CAM and Rockwall, he was explicit that he "did not possess the sole authority to enter into an agreement for a fixed term," and that "any agreement for a fixed term was . . . contingent upon being (1) reviewed and approved by [Rockwall's] Legal Department, (2) in writing and in a form that satisfied all corporate and legal formalities and requirements, and (3) executed by both parties." When CAM sought Batts's assistance with finalizing the EEIDD lease by requesting the status of the December 2017 Draft, and then asking for a purchase order from Rockwall for three years of warehousing services, Batts doubled down on his position, responding that no purchase order or signed writing could be issued without approval from Rockwall's counsel. Once Rockwall received the April 2018 Draft from its legal department, Batts promptly forwarded the draft to CAM for review, and even followed up because he "needed to get [the contract] put to bed." These facts denote Rockwall's contemplation that any

agreement with a fixed term would need to be in writing, passed through Rockwall's required channels of approval, and executed by both parties before having binding effect.

On this record, we agree with the district court that CAM and Rockwall "bargained for a written contract" with a fixed term, and thus the presumption of article 1947 that the parties were not bound to any fixed term "without a written, executed contract" is fitting.

2

Having established that article 1947 applies, we turn to CAM's next argument: that the district court erred by holding, in CAM's view, that the presumption created by article 1947 "cannot be rebutted through performance." Specifically, CAM highlights the following language from the district court's summary judgment order:

> We also failed to locate any Civil Code articles, revised statutes, or other legislative intentions that addressed this purported rebuttable presumption via performance. As neither legislation nor custom support[s] the proposition, we do not find that performance constitutes tacit acceptance of an unsigned, unfurnished, written contract.

Though the court never explicitly states that the article 1947 presumption is irrebuttable, CAM argues that the court's reasoning "clearly indicates" that it "would not accept that the presumption may be rebutted." Rockwall counters that the district court did not render "a blanket ruling that the presumption of [a]rticle 1947 could not be rebutted by performance," but rather determined that, based on the record, "the cases cited by CAM for the proposition of performance constituting tacit acceptance" were inapplicable.

No. 24-30806

There is no need for us to decide whether the district court's language stretches far enough to comprise a ruling that the article 1947 presumption can *never* be rebutted by performance. We deduce that CAM's reason for raising this point is to bolster its more critical argument that the district court "failed to consider whether the evidence submitted rebutted the presumption established." Assuming *arguendo* that the article 1947 presumption is rebuttable by performance, it was not rebutted in this case because, as detailed below, none of the alleged "actions and inactions of Rockwell" indicate that it consented to a three-year term.

B

CAM contends that the district court erred by rejecting its argument that Rockwall confirmed or ratified a three-year deal for warehousing services "by its performance." We disagree.

1

"Confirmation is a declaration whereby a person cures the relative nullity of an obligation." La. Civ. Code Ann. art. 1842 (1985). "An express act of confirmation must contain or identify the substance of the obligation and evidence the intention to cure its relative nullity." *Id.* "Tacit confirmation may result from voluntary performance of the obligation." *Id.* But, importantly, only a relatively null contract "may be confirmed." *Id.* at art. 2031. "A contract is relatively null when it violates a rule intended for the protection of private parties, as when a party lacked capacity or did not give free consent at the time the contract was made." *Id.* "Relative nullity may be invoked only by those persons for whose interest the ground for nullity was established, and may not be declared by the court on its own initiative." *Id.* Therefore, CAM first has the burden of establishing that the contract at issue is relatively null (due to involuntary consent, lack of capacity, or other means), and then showing that Rockwell confirmed the

12

contract. *See id.* Given that CAM has not met the former requirement, the district court correctly refrained from applying the doctrine of confirmation.

First, inherent in the "lack of voluntary consent" avenue towards showing a relatively null contract is that consent was given. *See id.* No evidence in the record before us signals that Rockwall consented to being bound to a three-year contract, whether orally or in writing. Rather, Batts's position from the outset of the negotiations was that Rockwall would not sign anything, nor agree to a fixed contract term, absent approval from its legal department and execution by both parties. Batts maintained this stance when asked by CAM for a purchase order for three years of warehousing services. When Rockwall's counsel returned the April 2018 Draft (a marked-up version of the draft initially proposed by CAM), it was promptly delivered to CAM for review. Rockwall never received any response from CAM regarding the substance of the April 2018 Draft, despite following up, and Shea later testified that he could not "recall" whether he discussed the April 2018 Draft with Batts after receiving it. On these facts, CAM has not surfaced anything showing that Rockwall consented—voluntarily or involuntarily—to a binding contract term.

Insofar as CAM argues that Rockwall's monthly payments constituted consent, that is unavailing. CAM provides a bevy of cases that purportedly support this argument, but in each of the proffered cases, the contract deemed to be confirmed by performance was considered a relative nullity due to either a deficiency of consent regarding a *signed* agreement,[6] or

---

[6] *See Harp v. Succession of Bryan*, 2019-0062, p. 10–14 (La. App. 1st Cir. 9/3/20), 313 So. 3d 284, 294–96 (holding that contracts signed by recreational vehicle park occupants and deceased property owner were relatively null and subject to confirmation by deceased property owner's wife, where the contracts were signed by the property owner and the park occupants, but not signed by wife as seller); *Meaghan Frances Hardcastle Tr. v. Fleur De Paris, Ltd.*, 2004-1371, p. 1–6 (La. App. 4th Cir. 6/29/05), 917 So. 2d 448, 449–51

some other means of nullification.[7] Here, absent any consent from Rockwall to a fixed term, by way of executing a contract or signing a document outlining the duration of its agreement with CAM, there was never any consent to a contract duration to begin with that could be considered a relative nullity for not being "free consent," or otherwise being defective. *Id.*

Further cutting against the notion of consent to a fixed term via Rockwall's payments is the fact that CAM's invoices are at odds with the payment structure contemplated by the parties at each step of their negotiations. Namely, CAM's initial bid, the December 2017 Draft, and the April 2018 Draft all contain an increasing fee schedule, with the first year rate's being $49,928.69 per month and rising to $55,728.66 per month in the second and third years. But the actual fees invoiced by CAM and paid by Rockwall never increased after the first year—they remained consistent from month to month. With the sole exception of the January 2018 invoice for prorated charges, CAM submitted invoices to Rockwall each month for the same amount ($49,928.69), and Rockwall paid the fee. This continued for twenty-eight months until Rockwall notified CAM, more than a month in advance of its final payment, that it would end the payments because it no longer required CAM's warehousing services.

Without an agreed-upon contract term, we find that this payment history via a series of invoices—a majority of which are described as

---

(finding that a landlord confirmed or ratified a renewal and extension of a commercial lease by continuing to accept rent payments from tenant, and where the renewal lease was relatively null from being signed by some but not all parties to the original lease).

[7] *See Favret v. Favret*, 527 So. 2d 463, 468 (La. App. 5th Cir. 1988) (holding that husband's agreement with former wife not to seek a reduction in her alimony payments was a relative nullity because it was confected after their judicial separation, but before their divorce, and that husband confirmed the agreement by making alimony payments pursuant to a divorce judgment for over nine years).

"monthly charges"—supports the district court's conclusion that the parties had a "valid oral contract whereby Rockwall obligated itself to pay monthly service fees to CAM for warehousing services." The payments do not go so far as showing that Rockwall consented to a definite term of three years for that oral agreement, such that a relative nullity could be shown and the principle of confirmation could be applicable.[8] *See* art. 2031.

## 2

CAM's argument that Rockwall ratified a three-year deal fails for a similar reason: no employee or agent of Rockwall entered into a contract for a fixed term.

"Ratification is a declaration whereby a person gives his consent to an obligation incurred on his behalf by another without authority." LA. CIV. CODE ANN. art. 1843 (1985). "An express act of ratification must evidence the intention to be bound by the ratified obligation." *Id.* "Tacit ratification results when a person, with knowledge of an obligation incurred on his behalf by another, accepts the benefit of that obligation." *Id.*

Here, as the district court observed, "CAM cannot benefit from ratification as there was no agent who entered into a contract without authority." Batts, the only Rockwall employee who could be conceived as having contracted with CAM, repeatedly asserted that he needed authorization from his employer's legal department to execute a contract

---

[8] To the extent CAM asserts that the "lack of capacity" avenue towards showing a relatively null contract allows for the confirmation doctrine of article 2031 to apply, that too fails. Batts's testimony that he "did not possess the sole authority to enter into an agreement for a fixed term" is not consequential, because Batts *never did* execute such an agreement. CAM cannot utilize a lack of capacity as an anchor for its confirmation argument under article 2031 when Batts never entered into an agreement for a fixed term from which his capacity to do so could be characterized as lacking in the first place.

with a fixed term, and that he "did not possess the sole authority" to do so himself. And as discussed above, no evidence suggests that Batts consented to the three-year term in the proposed agreements. *See supra* Part IV.B.I. Thus, neither express nor tacit ratification can be imputed to Rockwall when no "obligation [was] incurred on [its] behalf by" any agent or employee. art. 1843.[9]

## C

Next, we survey CAM's claim for detrimental reliance.

To establish detrimental reliance under Louisiana law, CAM "must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance." *Suire v. Lafayette City-Par. Consol. Gov't*, 2004-1459, p. 31 (La. 4/12/05), 907 So. 2d 37, 59; *see also* LA. CIV. CODE ANN. art. 1967 (1985) ("A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was

---

[9] Moreover, CAM's decision to file suit in Louisiana and seek the application of Louisiana law counsels against its contention that the three-year term proposed in both the December 2017 Draft and April 2018 Draft is enforceable. Each draft contains a forum selection clause that would have required the parties to bring suit in a state other than Louisiana, and a choice of law clause that would have required applying the laws of another state. Relying on principles of confirmation or ratification in this instance to allow CAM to enforce only the fixed-term provision of the two draft agreements, as opposed to enforcing the drafts in their entirety, would permit a form of cherry-picking that courts do not tolerate. *See Albrecht v. United States*, 329 U.S. 599, 603 (1947) ("And certainly where a party to such a contract stands upon its terms to enforce them for his own advantage, he cannot at the same time successfully disavow those terms so far as he conceives them to be to his disadvantage."); *U.S. Fid. & Guar. Co. v. Baldwin Lumber Co.*, 146 So. 743, 744 (La. 1933) ("The receiver cannot avail himself of so much of the contract as he believes is advantageous and reject that which he deems unprofitable.").

reasonable in so relying."). "[P]roof of a detrimental reliance claim does not require proof of an underlying contract." *Suire*, 907 So. 2d at 59. "Rather, the basis of detrimental reliance is 'the idea that a person should not harm another person by making promises that he will not keep.'" *Id.* (quotation omitted).

CAM's detrimental reliance claim falls short at the first element, as it fails to show that Rockwall made "a representation by conduct or word"—put simply, that Rockwall made a promise—to CAM for a three-year term for warehousing services. *See id.* As spelled out earlier, both parties contemplated a written services agreement to be bound. *See supra* Part IV.A.1. "This court is not the first to analyze detrimental reliance when the parties planned to enter into a written contract." *Rogers v. Brooks*, 122 F. App'x 729, 733 (5th Cir. 2004). For instance, as we have previously explained, the Louisiana Third Circuit Court of Appeal's decision in *Carter v. Huber & Heard, Inc.*, 95-142 (La. App. 3d Cir. 5/31/95), 657 So. 2d 409, is instructive on the matter:

> In *Carter*, a former employee agreed to return to manage the defendant's motel. The employee insisted on a two-year employment term and had his lawyers draft a contract. Although they exchanged drafts, the parties never signed a formal employment agreement. Nevertheless, the employee began work. Before two years passed, the employer sold the hotel, thereby ending the employment. The employee sued, claiming detrimental reliance. The trial judge found that the employer had never made a promise, and that, even if it had, the employee's reliance on that promise would be unreasonable. The appellate court agreed.
>
> Similarly, here the parties anticipated entering into a written agreement, and the proposed written agreement contained terms that were not mutually agreeable. Given the amount of on-and-off negotiation that the parties had gone through in the

> past, any reliance on an alleged promise to sell Oracle was unreasonable. Thus, summary judgment was proper on Rogers's detrimental reliance claim.

*Rogers*, 122 F. App'x at 733 (citation modified).

Like in *Carter* and *Brooks*, CAM had an attorney prepare a draft warehousing services agreement that included a three-year term of services for Rockwall. *See Carter*, 657 So. 2d at 411; *Brooks*, 122 F. App'x at 733. Both parties continued negotiations because the draft proposed by CAM "contained terms that were not mutually agreeable." *Brooks*, 122 F. App'x at 733. This led to Rockwall's having its legal department prepare a markup of the initial draft contract, which retained the same three-year term and was delivered to CAM for review. In the meantime, CAM began providing warehousing services to Rockwall and sending monthly invoices for the services rendered, which Rockwall paid accordingly. It is undisputed that, over the course of this monthly arrangement between CAM and Rockwall (which persisted for twenty-eight months until Rockwall provided notice of termination), neither party executed a written agreement containing a fixed contract term.

We find that, "[g]iven the amount of on-and-off negotiation" between CAM and Rockwall, *Brooks*, 122 F. App'x at 733, and the absence of a signed agreement encapsulating a fixed term, there was never "a representation" for a contract duration that CAM could have justifiably relied on when executing a three-year lease with EEIDD. *Suire*, 907 So. 2d at 59. Even if CAM and Rockwall had *anticipated* a three-year relationship throughout their negotiation process, that does not equate to a *promise* for a definite relationship from which detrimental reliance could spawn. *See Carter*, 657 So. 2d at 411; *Brooks*, 122 F. App'x at 733.

No. 24-30806

CAM argues that the district court erred by failing to consider two cases where we held that the plaintiff's reliance on an oral agreement was reasonable despite that a written agreement was contemplated: *Breaux v. Schlumberger Offshore Services, Division of Schlumberger Ltd.*, 817 F.2d 1226, 1230–32 (5th Cir. 1987), *opinion reinstated*, 836 F.2d 1481 (5th Cir. 1988), and *Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1069 (5th Cir. 1993). Whether the district court considered these cases is of no consequence—each is readily distinguishable.

In *Breaux*, an employee of Schlumberger, an offshore oil company, reviewed various options for office space in Lafayette, Louisiana that his employer could lease, including a building owned by Breaux. 817 F.2d at 1228. The employee orally represented to Breaux that Schlumberger preferred to lease his space. *Id.* During informal negotiations, the employee informed Breaux "that final approval would have to come from his superiors at Schlumberger." *Id.* At this point, the employee and Breaux "had agreed on all the material lease terms." *Id.* at 1230. The employee then represented in writing that he obtained approval from his superiors by sending Breaux a letter stating that the vice-president of Schlumberger had "selected" Breaux's building to lease and "confirmed" Schlumberger's "intention to enter a rental agreement" for a portion of the building. *Id.* at 1228, 1230. Breaux responded by "promising to cease all efforts to rent the subject space" and holding the space for Schlumberger until the projected move-in date. *Id.* at 1228. As requested by the employee, Breaux mailed Schlumberger a proposed lease agreement for signature, but Schlumberger delayed signing the agreement, in part due to a crisis in the oil industry that made office space in Lafayette less attractive. *Id.* Breaux filed suit for specific performance, after which Schlumberger leased a different premises for its office needs. *Id.* at 1228–29. Breaux immediately began searching for other tenants but was unable to lease the building on terms as favorable as those in

19

the Schlumberger deal. *Id.* at 1229. He then amended his complaint to include a plea for damages, relying in part on a theory of detrimental reliance. *Id.*

In relevant part, we found that Breaux had established the first detrimental reliance element of "a representation by conduct or word" because Schlumberger entered "into an oral lease through the actions and letters of" its employee. *Id.* at 1230; *see id.* at 1230 n.3 ("Schlumberger's attempt to parse [the employee's] letters so as not to manifest his 'consent' is unpersuasive; in context, the language plainly indicates his satisfaction with the agreement"). In contrast, no such representation can be seen in any of the actions taken by Batts as a Rockwall employee. Though both Batts and the Schlumberger employee initially told their respective parties across the table that they required approval from superiors before executing a contract, the difference is that Batts *maintained* this position throughout his negotiations with Shea, while the Schlumberger employee later decided to execute a letter representing that he had approval to contract on his employer's behalf. *Id.* at 1228, 1230. Thus, *Breaux* does not move the needle opposite of a finding that CAM's detrimental reliance claim is inadequate.

*Newport* fares no better for CAM. In that case, both parties signed a letter of intent, titled a "letter agreement," where they expressed an intent "to enter into the transaction on substantially the . . . terms and conditions contained in the letter." *Newport*, 6 F.3d at 1066 (quotations omitted). We found that the letter of intent provided sufficient details from which a reasonable jury could conclude that the parties intended the letter to serve as a contract, which therefore allowed for a detrimental reliance claim to be sustained from the promises contained therein. *Id.* at 1069. On the record before us, there is no letter of intent or any other executed document on which CAM could have reasonably relied when taking the risk of finalizing a

No. 24-30806

three-year lease with EEIDD. Therefore, the district court properly dismissed CAM's detrimental reliance claim.

D

Lastly, CAM argues that the district court's ruling was improper because "genuine issues of material fact as to Rockwall's consent to a three-year term" and "whether the parties bargained for a certain form" precluded the court's grant of summary judgment. CAM highlights the following in support of this argument: the roughly two years of monthly payments by Rockwall, and Batts's forwarding of the April 2018 Draft to CAM for review, which included the proposed three-year term.[10]

_____

[10] CAM underscores two additional facts that purportedly bar summary judgment in Rockwall's favor. First is an email from Shae to Batts asking, "are we okay to start working at the agreed upon billing rate without a contract?" Second is the language of a "Transportation and Spotting Services" clause of the April 2018 Draft sent by Rockwall, and CAM's arrangement of such services per the clause.

As an initial matter, we need not consider the merits of these arguments because CAM raised them for the first time in its motion for reconsideration. *See Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 185 (5th Cir. 2018) ("We will not consider new evidence or arguments raised for the first time in a motion for reconsideration."). Even if we were to consider these new arguments, they are unpersuasive. Regarding Shea's email inquiring about whether CAM could "start working at the agreed upon billing rate without a contract," we note two observations: (1) Shea's question refers specifically to CAM's ability to proceed at the *billing rate* without a contract and says nothing about a fixed term, and (2) the record is devoid of any response from Rockwall to this question. Rockwall's silence surely does not constitute, in CAM's words, "encouragement to proceed with the operation" for a set duration. And, at any rate, CAM points to no jurisprudence that would enable its unilateral question in the email to impose a binding contract on Rockwall for a fixed term. As for the transportation and spotting services clause, it takes nothing away from the fact that the draft contract wherein the clause is contained is just that: a *draft*, which was exchanged between the parties but never executed, and appears to have remained in CAM's inbox for almost two years while CAM invoiced Rockwall for warehousing services each month.

No. 24-30806

As we've previously detailed, on this record, the monthly invoices sent by CAM and paid by Rockwall are insufficient to show that Rockwall's actions rebutted the presumption that the parties intended to be bound by a written contract. *See supra* Part IV.B.1. And CAM does not offer any caselaw supporting that the inclusion of a fixed term in the April 2018 Draft—a proposal that was never executed, let alone responded to by CAM as to its substance—should be given binding effect. In all, we hold that no genuine dispute of material fact exists that would render the district court's summary judgment erroneous.[11]

V

For the foregoing reasons, we AFFIRM.

---

[11] Given our affirmance based on the above grounds, we need not reach CAM's additional request of reversing the district court's denial of its motion for partial summary judgment.